[No. B154372. Second Dist., Div. Three. Nov. 14, 2002.]

ANTHONY CHOY, Plaintiff and Appellant, v.
REDLAND INSURANCE COMPANY et al., Defendants and
Respondents.

## COUNSEL

Knapp, Petersen & Clarke, Gwen Freeman and Mitchell B. Ludwig for Plaintiff and Appellant.

Koletsky, Mancini, Feldman & Morrow, Roy A. Koletsky and Raymond C. Dion for Defendants and Respondents Redland Insurance Company and Acceptance Insurance Company.

Lewis Brisbois Bisgaard & Smith, Kenneth C. Feldman, Bartley L. Becker and Jeffry A. Miller for Defendants and Respondents Zinder, Blackburn,

Park, Clements & Keenan, Mercer & Zinder, Kevin H. Park and Zinder, Blackburn & Park.

**OPINION**

**CROSKEY, Acting P. J.**—Anthony Choy, the plaintiff below (Choy), appeals from judgment on the pleadings and the resulting dismissal with prejudice of his complaint against the defendants Redland Insurance Company (Redland), Acceptance Insurance Company (AIC; collectively insurer defendants), Zinder, Blackburn, Park, Clements & Keenan, Mercer & Zinder, Kevin H. Park and Zinder, Blackburn & Park (attorney defendants). The trial court granted the motion of the insurer and attorney defendants on the ground of a lack of jurisdiction to proceed because the trial court held that Choy's complaint arose from and was based upon matters that were within the exclusive jurisdiction of the federal bankruptcy court.

After a review of the record and the relevant statutory and case law, we have concluded that the trial court's ruling was correct. We will therefore affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

On January 31, 2000, Choy filed this action against the insurer and attorney defendants. He alleged two causes of action: (1) intentional infliction of emotional distress and (2) abuse of process. In support of those claims he alleged the following facts.

On November 17, 1994, Choy was severely injured in a motor vehicle accident. Prior to the accident, Shamrock Tires, Inc. (Shamrock), had sold to Choy a "lift kit" to modify and install lifters on his pickup truck. In the litigation Choy filed following his accident,[2] he alleged that the lifters were defective and caused the chassis of his pickup truck to separate from the cab when the truck was pushed into the center divider of the freeway by a big rig.

---

[1] The facts that we recite are not in dispute and are based upon the allegations of Choy's complaint and the procedural history of this case as demonstrated by the appellate record before us.

[2] In 1995, Choy filed an action in the Los Angeles Superior Court entitled *Choy v. Owl Rock Products Company, et al.,* No. GC015739 (underlying action). The defendants sued in that action, in addition to Shamrock and the trucking company that owned the big rig that struck Choy's pickup truck, included the manufacturer of the lift kit and the distributor.

During Choy's prosecution of the underlying action against the several defendants, all of whom took the position that the accident was due entirely to Choy's own negligence, there were a number of settlements. The manufacturer of the lift kit accepted a policy limits offer to settle and paid $1 million; similarly, the distributor paid $6 million. Choy alleges, however, that such settlements covered only a portion of his total damages; for example, his economic damages alone totaled $10 million. Choy also asserts that "a neutral and disinterested judge" had placed a value of $20 million to $40 million on his case.

Shamrock, which Choy claims was highly culpable because it had sold him the lift kit with bolts that were of the wrong size, refused to accept a policy limits settlement offer. Shamrock carried liability insurance with Redland.[3] On June 2, 1998, Choy made a written demand to settle his claims against Shamrock for the $500,000 policy limits of the Redland policy. This settlement was rejected by Redland. The attorney defendants had been retained by Redland to provide a defense for Shamrock and one of them, Kevin H. Park (Park), communicated Redland's rejection of the offer to Choy's counsel. Thereafter, Choy made a second settlement offer under which Choy would give Shamrock (which was apparently insolvent) a covenant not to execute (on any judgment that might be obtained in the underlying action) in exchange for Shamrock's assignment to Choy of its rights against Redland; Choy also offered his commitment to cooperate with Shamrock "to preserve Shamrock's own first party claims against Redland for emotional distress and punitive damages." This offer was likewise rejected. Park delivered Redland's rejection to Choy's counsel without, according to Choy's allegations, ever communicating the offer to Shamrock.

Choy alleges that Redland was guilty of bad faith when it refused these settlement offers because Shamrock's liability was clear, "the damages to [Choy] were catastrophic, and the settlements paid by other defendants, although frequently encompassing 'policy limits,' did not come close to fully compensating [Choy] for his injuries. A prudent insurer with knowledge of the facts known to Redland would have immediately tendered the $500,000 policy limits to settle this claim and protect its insured . . . from potentially catastrophic exposure far in excess of the policy limits should the case against [Shamrock] proceed to trial. However, Redland unreasonably and in bad faith rejected [Choy's] offer to settle his claims . . . for the

---

[3]It appears that AIC also provided liability coverage to Shamrock, although the nature of that coverage is not entirely clear. Our reference to Redland or "insurer defendants" is intended to include AIC. Given the issues before us, the nature and character of that insurer's exposure is not relevant.

$500,000 policy limits, leaving [Shamrock] exposed to catastrophic exposure far in excess of the Redland policy limits at trial."[4] In addition, Choy alleges that Park violated his professional responsibilities to Shamrock by the failure to communicate the offers to Shamrock and his representation of Redland's interests over those of Shamrock, which, by virtue of the terms of the second offer, had a serious conflict of interest with Redland.

While the underlying action was still pending against Shamrock as the sole remaining nonsettling defendant, and prior to the trial thereof, Shamrock filed a voluntary petition in bankruptcy under chapter 7.[5] Choy alleges that such bankruptcy filing served no rational or legitimate purpose, since the individual owners of Shamrock had contemporaneously filed personal voluntary petitions and, in due course, had received a discharge. The real purpose of such filing, according to Choy's complaint, was to frustrate his ability to seek and obtain a judgment against Shamrock in excess of the $500,000 limit of the Redland policy. The bankruptcy filing, Choy alleges, was done on the initiative of Redland, which paid all of the necessary filing fees, so that Redland could avoid liability for its bad faith conduct in rejecting Choy's earlier offers to settle.[6]

Choy alleges that he had a reasonable expectation of a judgment well in excess of Redland's policy limits, and that Redland's action in instigating an

---

[4]In his complaint, Choy expanded on his rationale as to why Redland's actions constituted bad faith: "Where a liability insurer unreasonably and in bad faith rejects an offer to settle an action against its insured within policy limits, and an award is made against its insured in excess of policy limits at trial, the liability insurer incurs significant legal liability to its insured. The insurer is liable to its insured for all monies awarded against the insured in excess of the original policy limits, is liable to the insured for emotional distress damages and may also in an appropriate case be held liable to its insured for punitive damages arising from its wrongful refusal to settle the claim within policy limits. [¶] Normally, an insured subjected to a judgment in excess of policy limits after its liability insurer unreasonably rejects an offer to settle within policy limits will assign to the personal injury claimant its right to collect from its insurer the portion of the judgment exceeding policy limits in exchange for a covenant by the personal injury claimant not to execute on the personal assets of the insured. The insured will normally retain its own claims against the insurer for emotional distress damages and/or punitive damages. To avoid splitting a cause of action, the personal injury claimant and the insured will normally join in a lawsuit against the insurer, with the personal injury claimant recovering from the insurer the portion of the award against the insured exceeding policy limits, and the insured recovering from its insurer damages for emotional distress and punitive damages."

[5]Under chapter 7 of the Bankruptcy Code (11 U.S.C. § 701 et seq.), a corporate (as opposed to an individual) debtor's assets are simply liquidated and the corporation will cease to exist except as an empty shell; there is no provision for a discharge from bankruptcy as there is for the individual debtor (see 11 U.S.C. § 727(a)(1) ["The court shall grant the debtor a discharge unless—[¶] (1) the debtor is not an individual"].)

[6]Choy emphasizes that after the bankruptcy petition was filed, Redland offered to settle Choy's claim for $300,000. He claims that this circumstance establishes the real purpose of the bankruptcy filing: to discourage Choy from seeking an excess judgment and to pressure him into accepting a sum less than the policy limits.

otherwise pointless bankruptcy petition on behalf of an insolvent corporation constituted a misuse of the bankruptcy process. In the words of Choy's complaint, Shamrock's bankruptcy petition was "filed not to protect or to benefit [Shamrock], but rather to protect Redland from incurring liability exceeding its policy limits as a result of [Choy's] claims against [Shamrock] . . . ."[7]

Based on these allegations, Choy pled causes of action for (1) intentional infliction of emotional distress and (2) abuse of process, and sought substantial compensatory and punitive damages. Following discovery and multiple law and motion proceedings on August 24, 2001, the insurer and attorney defendants filed a motion for judgment on the pleadings. One of the issues raised in support of the motion was that both of the claims asserted by Choy in his complaint depended upon a determination that Shamrock's bankruptcy petition had been filed in bad faith and such a determination was within the *exclusive* jurisdiction of the federal bankruptcy court. As a result, the defendants urged, the trial court had no jurisdiction to proceed and the complaint should be dismissed.

After soliciting and receiving extensive and specific briefing on this issue, on October 22, 2001, the trial court heard oral argument and ruled in favor of the defendants, granting their motion. Thereafter, a judgment of dismissal was entered on November 30, 2001. Choy has prosecuted this timely appeal.

## CONTENTIONS OF THE PARTIES

Choy, while recognizing the settled principle of law that a bankruptcy court has exclusive jurisdiction over claims for abuse of process which are asserted *by or against a debtor* in bankruptcy, argues that such rule has no application in a case, such as this one, where the claim is not asserted against the debtor, but rather against the debtor's insurer and attorneys. The insurer and attorney defendants argue that such a distinction is one without a difference, given the state of bankruptcy law.

We agree with this latter argument, as did the trial court.

[7]The record reflects that on or about September 12, 2000, about nine months after he filed this action and more than a year prior to the dismissal of his complaint, Choy entered into a settlement agreement with the bankruptcy trustee whereby the trustee agreed to approve a claim against Shamrock for $26,225,000. Choy was approved as a general unsecured creditor in that amount. In exchange, Choy promised to share his recovery in this matter. For reasons not disclosed by the record, he did *not* receive an assignment from the trustee of Shamrock's rights against the insurer defendants.

## Discussion

### 1. *Standard of Review*

**(2)** We review a judgment on the pleadings, such as the one before us, essentially the same way we would review the granting of a general demurrer without leave to amend. We test the sufficiency of the allegations of a plaintiff's complaint to state a viable cause of action. (*Pang v. Beverly Hospital, Inc.* (2000) 79 Cal.App.4th 986, 989 [94 Cal.Rptr.2d 643].) We assume the truth of all of the factual allegations (but not the contentions) and give them a liberal construction. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515-516 [101 Cal.Rptr.2d 470, 12 P.3d 720].) This requires resolution of a mixed question of law and fact that is predominantly one of law, that is, whether the *factual* allegations of the plaintiff's complaint are sufficient to constitute a cause of action. (*Ibid.*) The resolution of a question of this sort calls for an examination de novo. (*Ibid.*) The threshold and dispositive issues before us of jurisdiction and federal preemption also necessarily call for independent de novo review as issues of law.

### 2. *Federal Preemption of Bankruptcy Remedies*

· The viability of Choy's claims, from the perspective of the jurisdictional issue, depends upon his right to litigate, *in state court*, the question of Shamrock's alleged "bad faith" bankruptcy petition. The defendants argue that Choy must fail because such a claim may not be litigated in state court due to federal preemption. "Federal preemption of state law can occur in three circumstances: (1) express preemption where Congress explicitly preempts state law; (2) implied preemption where Congress has occupied the entire field (field preemption); and (3) implied preemption where there is an actual conflict between federal and state law (conflict preemption). [Citations.]" (*Gracia v. Volvo Europa Truck, N.V.* (7th Cir. 1997) 112 F.3d 291, 294; see also *English v. General Electric Co.* (1990) 496 U.S. 72, 78-79 [110 S.Ct. 2270, 2274-2275, 110 L.Ed.2d 65].)

"The pre-emption doctrine, which has its roots in the Supremacy Clause, U. S. Const., Art. VI, cl. 2, requires us to examine congressional intent. Pre-emption may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.' [Citation.] Absent explicit pre-emptive language, Congress' intent to supersede state law altogether may be inferred because '[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' because 'the Act of Congress may touch a field

in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or because 'the object sought to be obtained by the federal law and the character of the obligations imposed by it may reveal the same purpose.' [Citation.]" (*Fidelity Federal Sav. & Loan Assn. v. de la Cuesta* (1982) 458 U.S. 141, 152-153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664].)

In *MSR Exploration, Ltd. v. Meridian Oil, Inc.* (9th Cir. 1995) 74 F.3d 910 (*MSR Exploration*), the circuit court affirmed the district court's determination that a bankruptcy debtor's action for malicious prosecution against a creditor (who had allegedly maliciously pursued claims against debtor in bankruptcy), was preempted by the Bankruptcy Code.[8] (11 U.S.C. § 101 et seq.) In support of that conclusion, the court noted that the detailed and comprehensive nature of the Bankruptcy Code "demonstrates Congress's intent to create a whole system under federal control which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike. While it is true that bankruptcy law makes reference to state law at many points, *the adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal.* It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process. [¶] Debtors' petitions, creditors' claims, disputes over reorganization plans, disputes over discharge, and innumerable other proceedings, would all lend themselves to claims of malicious prosecution. Those possibilities might gravely affect the already complicated processes of the bankruptcy court. [Citations.] Of course, the opportunities for asserting malicious prosecution claims would only be limited by the fertility of the pleader's mind and by the laws of the state in which the proceeding took place. [¶] In short, the highly complex laws needed to constitute the bankruptcy courts and regulate the rights of debtors and creditors also underscore the need to jealously guard the bankruptcy process from even slight incursions and disruptions brought about by state malicious prosecution actions. To put it another way, the problem here is not only one of state courts deciding issues of federal law in one manner or another. That is not an entirely unique situation, even when uniformity is required. [Citation.] The

[8]Cases sometimes refer to the Bankruptcy Code as the Bankruptcy Act. However, in 1978, the then Bankruptcy Act was repealed (Pub.L. No. 95-598 (Nov. 6, 1978) tit. IV, § 401(a), 92 Stat. 2682.), and the law related to bankruptcy was "codified and enacted as title 11 of the United States Code, entitled 'Bankruptcy,' . . ." (Pub.L. No. 95-598 (Nov. 6, 1978) tit. I, § 101, 92 Stat. 2549.) Congress clearly intended the new law to be referred to as the Bankruptcy Code, not as the Bankruptcy Act. (See, e.g., Pub.L. No. 103-394 (Oct. 22, 1994), tit. VI, § 603, 108 Stat. 4147 [creating the National Bankruptcy Review Commission and charging it with investigating and studying issues and problems related to title 11, United States Code, "commonly known as the 'Bankruptcy Code' "].)

difficulty here goes much deeper. It is a question of state courts, in effect, interfering with the whole complex, reticulated bankruptcy process itself." (*MRS Exploration,* at p. 914, fn. omitted, italics added.)

 As we now discuss, these principles are dispositive of Choy's attempt in this case to prosecute this action that seeks redress in a state court for an alleged bad faith filing of a voluntary bankruptcy petition.

### 3. Choy's Action Based on Alleged Bad Faith Filing of Bankruptcy Petition Is Preempted by Federal Law

In *Gonzales v. Parks* (9th Cir. 1987) 830 F.2d 1033 (*Gonzales*), chapter 11 debtors sought relief in the bankruptcy court from a creditor's state court action that had alleged that the debtors' bankruptcy petition constituted an abuse of process. The creditor had sought to foreclose on a deed of trust on the debtors' home, but the trustee's sale was halted upon the debtors' filing of a voluntary petition in bankruptcy. The creditor filed a tort action in state court against both the debtors and their attorney, alleging that the filing of the petition was an abuse of the bankruptcy laws and process. The debtors did not appear and a $10,000 default judgment was awarded against them. They sought relief from the judgment in the bankruptcy court where a summary judgment in their favor was granted declaring the state court default judgment void at its inception as violative of the automatic stay provision of the Bankruptcy Act, 11 United States Code section 362(a).

The circuit court affirmed the ruling of the bankruptcy court, but on a different ground. In language that is relevant to the arguments asserted by Choy in this matter, the court stated, "State courts are not authorized to determine whether a person's claim for relief under a federal law, in a federal court, and within that court's exclusive jurisdiction, is an appropriate one. Such an exercise of authority would be inconsistent with and subvert the exclusive jurisdiction of the federal courts by allowing state courts *to create their own standards as to when persons may properly seek relief in cases Congress has specifically precluded those courts from adjudicating.* [Citation.] The ability collaterally to attack bankruptcy petitions in the state courts would also threaten the uniformity of federal bankruptcy law, a uniformity required by the Constitution. U.S. Const. art. I, § 8, cl. 4. [¶] That Congress' grant to the federal courts of exclusive jurisdiction over bankruptcy petitions precludes collateral attacks on such petitions in state courts is supported by the fact that remedies have been made available in the federal courts to creditors who believe that a filing is frivolous. Debtors filing bankruptcy petitions are subject to a requirement of good faith, [citation], and violations of that requirement can result in the imposition of

sanctions [citations]. *Congress' authorization of certain sanctions for the filing of frivolous bankruptcy petitions should be read as an implicit rejection of other penalties, including the kind of substantial damage awards that might be available in state court tort suits.* Even the mere possibility of being sued in tort in state court could in some instances deter persons from exercising their rights in bankruptcy. In any event, it is for Congress and the federal courts, not the state courts, to decide what incentives and penalties are appropriate for use in connection with the bankruptcy process and when those incentives or penalties shall be utilized." (*Gonzales, supra,* 830 F.2d at pp. 1035-1036, italics added.)

The reasoning of *Gonzales* has been followed by several California appellate decisions. In *Pauletto v. Reliance Ins. Co.* (1998) 64 Cal.App.4th 597 [75 Cal.Rptr.2d 334], the defendant insurers filed proceedings in the bankruptcy court to contest the dischargeability of a debt owed to the insurers by the bankruptcy debtor on the ground that money had been obtained from them fraudulently. After the bankruptcy court had ruled in the debtor's favor and rejected the insurers' objections to dischargeability, the debtor filed an action for malicious prosecution in state court. The trial court sustained the defendant insurers' general demurrer without leave to amend. Relying on *Gonzales,* as well as its own earlier decision in *Gene R. Smith Corp. v. Terry's Tractor, Inc.* (1989) 209 Cal.App.3d 951 [257 Cal.Rptr. 598], the court concluded that the debtor's malicious prosecution claim was implicitly preempted by federal bankruptcy law under principles of both field and conflict preemption.

In *Gene R. Smith,* a debtor had sued a creditor for the malicious prosecution of an involuntary bankruptcy petition against the debtor. The *Gene R. Smith* court noted that 11 United States Code section 303(i) "permits the bankruptcy court on dismissal of a petition to award a debtor costs, reasonable attorney's fees and any damages proximately caused by the taking of the debtor's property. If the involuntary petition is filed in bad faith the bankruptcy court has the additional power to award damages proximately caused by such filing and punitive damages. [¶] This provision reflects Congress's intent that the case-by-case development of law relating to 'bad faith' in this context should be accomplished in federal courts and not in state courts. The parties make no effort to distinguish the difference, if any, between conduct constituting 'bad faith' and 'malicious prosecution' treating both as virtually identical. On that assumption, it would indeed be anomalous and, to say the least, inconsistent with this legislative intent for state courts to develop a different, more liberal definition of 'bad faith' for malicious prosecution purposes than that developed in the federal system. Different standards defining identical conduct adds an unnecessary and

confusing component to the uniform law to be applied in bankruptcy proceedings. The additional risk that substantial damage awards in state courts would create a material disincentive to those seeking to use the bankruptcy laws only exacerbates the problem. The determination of damages in state courts should not determine the potential cost of entry into the federal bankruptcy system." (*Gene R. Smith Corp. v. Terry's Tractor, Inc., supra,* 209 Cal.App.3d at pp. 954-955.)

In *Idell v. Goodman* (1990) 224 Cal.App.3d 262 [273 Cal.Rptr. 605], the court applied the reasoning of *Gene R. Smith* to a case where the bankruptcy debtor had filed a malicious prosecution action against a creditor for "improperly" objecting to the discharge of the debtor's fiscal obligations. The *Idell* court also emphasized the admonition from the *Gonzales* court. "The existence of federal sanctions for the filing of frivolous and malicious bankruptcy pleadings must be read as an implicit rejection of state court remedies. The mere possibility of being sued in tort in state court, with the potential for substantial damage awards, could deter persons from exercising their rights in bankruptcy. Thus, it is for Congress and the federal courts, not state courts, to decide what incentives and penalties shall be utilized in the bankruptcy process." (*Id.* at p. 271.)

The *Pauletto* court summarized its conclusion by noting that "[t]he line of cases we follow, from *Gonzales* to *MSR Exploration, Ltd.,* make it clear that *no authorized bankruptcy proceeding can properly support a state-law claim for malicious prosecution or abuse of process.* Such state-law tort claims impermissibly intrude upon exclusive federal authority over bankruptcy proceedings and threaten the uniformity of federal bankruptcy law regardless of the nature of the underlying proceeding." (*Pauletto v. Reliance Ins. Co., supra,* 64 Cal.App.4th at pp. 605-606, italics added.)

Finally, and most recently, the court in *Saks v. Parilla, Hubbard & Militzok* (1998) 67 Cal.App.4th 565 [79 Cal.Rptr.2d 120], held that an individual who had been made a defendant in a bankruptcy adversary proceeding on the allegations of a debtor (undergoing a voluntary chapter 11 bankruptcy) that such individual owed $1.5 million to the debtor, could not, after prevailing on such proceeding, sue the debtor in state court for malicious prosecution. The trial court, due to the principles of federal preemption discussed above, was simply without jurisdiction to hear such a claim. Relying on the same authorities as the *Pauletto* court, the *Saks* court emphasized the principle that we believe is dispositive of Choy's claims. "[*N*]o authorized bankruptcy proceeding can properly support a state-law claim for malicious prosecution or abuse of process." (*Id.* at p. 571, italics in original.)

 Choy seeks to distinguish his case from all of the foregoing authorities by pointing out that they all involved suits *by or against* bankruptcy debtors. Here, he argues, he seeks to proceed against nonbankruptcy parties for their act of inducing and causing the bankruptcy of Choy's alleged debtor in order to benefit themselves by reducing the insurer defendants' exposure under their policies. We believe that this is a distinction without a difference. There are three reasons for this conclusion. First, in order to succeed, Choy's claim would still require the trial court to adjudicate the question of whether Shamrock's petition had been filed in "good faith" within the meaning of the Bankruptcy Code. Based upon the principles articulated above in a long string of well reasoned authorities, it would appear that the trial court would be required to engage in the very same activity (i.e., a determination as to whether Choy's bankruptcy filing was in "bad faith") that is expressly condemned by those authorities.

Second, the authorities we have cited place no emphasis upon the circumstance that the questioned proceeding was brought "by or against a debtor." What they do clearly emphasize is the principle that no *authorized proceeding* in bankruptcy can be questioned in a state court or used as the basis for the assertion of a tort claim in state court against any defendant. However, Choy's claim is that Shamrock was allegedly "induced" to file a bankruptcy petition. Yet, Shamrock clearly had a legal right to do so under bankruptcy law; such filing was an "authorized proceeding." That Shamrock may have had a claim against the insurer defendants for their "bad faith" rejection of Choy's settlement offer is not helpful to Choy. If a bad faith claim against the insurer defendants was one of Shamrock's assets, it was for the bankruptcy trustee to pursue it. Choy was free to file a claim in bankruptcy and have that claim approved or adjudicated (which he did by virtue of the settlement described in fn. 7, *ante*) and, if such claim exceeded the relevant policy limits of the insurer defendants, to request that the trustee pursue a claim for an excess judgment against the insurer defendants.[9] In short, the "authorized proceeding" in bankruptcy was not only exclusive, it was adequate.

Finally, to allow Choy to proceed against the insurer defendants or the attorney defendants because his state court action was not "by or against a debtor" would serve only as an impermissible circumvention of the prohibition on direct bad faith actions against insurers by third party claimants.

---

[9]It appears that such a separate action has been filed by the trustee (*Wolkowitz v. Redland Ins. Co.* (Super. Ct. L.A. County, 2001, No. BC258637)). The question as to whether the stipulated settlement agreement approving Choy's claim for $26,225,000 is the equivalent of a final excess judgment that would support an action for bad faith by the trustee is now before this court in the *Wolkowitz* action (*Wolkowitz v. Zinder, Blakburn, Park, Clements & Keenan* (B158594, app. pending)).

(*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 304 [250 Cal.Rptr. 116, 758 P.2d 58].) Choy's claims for emotional distress and abuse of process are simply thinly disguised attempts to plead around *Moradi-Shalal*, as both claims, at bottom, are based upon his assertion that the insurer defendants unreasonably refused to accept Choy's policy limits settlement offer. This is a claim he neither owns nor, on the record before us, is entitled to prosecute.

As did the court in *Saks,* we conclude that the gist of Choy's complaint is that the defendants misused the bankruptcy process by causing Shamrock to file a petition in bankruptcy. Choy had a number of potential remedies available to him in the bankruptcy court,[10] but chose not to use them. He cannot use state court tort remedies to circumvent well established federal rules relating to redress for the misuse of the bankruptcy process.

### DISPOSITION

The judgment of dismissal is affirmed. The several defendants shall recover their costs on appeal.

Kitching, J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 11, 2003.

---

[10]In addition to a claim settlement with the trustee, these potential remedies included, inter alia, allowing sanctions for frivolous and harassing filings (Fed. Rules Bankr.Proc., rule 9011, 11 U.S.C.); giving the bankruptcy court authority to prevent abuse of process (11 U.S.C. § 105(a)); providing for dismissal on grounds of substantial abuse (11 U.S.C. § 707(b)); and allowing dismissal. (11 U.S.C. §§ 930, 1112; see also *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1239-1240 [32 Cal.Rptr.2d 136] [the bankruptcy court entered an order allowing personal injury plaintiffs to (1) recover and execute against all the bankrupt defendant's available insurance for such claims, and (2) file claims in the bankruptcy proceeding for the insured portion of the judgment and for the uninsured portion of the judgment, " 'that amount being the difference between the judgment and the amount of insurance coverage available to pay [plaintiffs' claims], subject to the right of the trustee to object to said claims.' " The bankruptcy court also partially lifted the automatic stay, thus allowing the state court to conduct a jury trial, and limited the amount of recovery, but not the amount of the judgment].)